May it please the Court, and I would like to reserve three minutes for rebuttal. The jury found that Defendant Medallia willfully and maliciously stole my client Echospan's most valuable trade secret. Medallia did this by lying to gain access to Echospan's system and then performing what Medallia's employees called a lift and shift of Echospan's software into the competing software that Medallia was developing. The jury awarded $25.7 million in compensatory and exemplary damages, and the District Court granted judgment as a matter of law on the issue of damages only, reducing that number to zero. In doing so, the District Court failed to adhere to the strict standard for granting judgment as a matter of law, and it also misapplied the law on damages. So I'd like to talk about those two issues in turn, keeping in mind that my job first and foremost is to answer any questions this Court may have along the way. In ruling on a judgment as a matter of law, the question is whether no reasonable juror could reach the verdict that the jury reached. In other words, if there's a way to reconcile the verdict and the evidence, the Court must do so and uphold the verdict, drawing all reasonable inferences in favor of the evidence, disregarding conflicting evidence. In this case, the jury awarded less – the jury found that Medallia misappropriated fewer than all of the trade secrets Echospan alleged.  One. And so it awarded less than the total damages Echospan sought. What's the causal connection between the appropriation of secret six and $11.7 million in the evidence? Because I thought that your expert witness testified that there was no way to apportion the damages caused by the appropriation of several of these items. So what the expert did – were you? No. So what the expert testified to was that his damages model did not separately break down the trade secrets on a trade secret by trade secret basis. What he was not testifying was that it was impossible to make any – to draw any to work down or to determine. Was he asked that question? He wasn't asked that question, correct. And so in this case, what did the jury hear? The jury heard about all of the trade secrets. Each of the trade secrets from both expert witnesses and lay witnesses saw a demonstration of the trade secrets, too. There was a particular emphasis on trade secret six, which is the one that was found to be misappropriated, the hub, the head of the octopus, the most significant trade secret that had its fingers and all the others. Then we had Medalia's expert who testified on cross-examination that the indispensability of a particular trade secret to a unified whole is relevant to determining the amount of damages. That's relevant evidence of damages. And then you had Echospan's expert, and he testified that this was an integrated software program. So, you know, 20 years ago, maybe 10 years ago, we would have gone to Best Buy and bought a box that had a CD-ROM in it. We'd put that CD-ROM in our computer and install a program. That's what we're talking about here, a single program with many parts. And so when Medalia performed its lift and shift, it took that program and integrated it into its competing program. And you also had Echospan's expert testify on page 1827 of Volume 9 that even if some trade secrets drop out, if the remaining secret or secrets are value drivers, it is appropriate to award the full amount. Now, the jury didn't do that. The jury awarded half of the total amount. But that is within the range of the evidence. And according to Georgia law, which governs here, that means it must be affirmed. I mean, that's all that's required in your position, that as long as it's within the range, there doesn't have to be anything else to help us understand why the jury picked that particular number. They could have picked it out of the air, but it's less than the full amount, and they found less than the full amount of violations, and so good enough. Under the Georgia cases, it does – the Georgia cases do – you know, Trotman and White both say it is within the range of the evidence, so it shall be affirmed. And I'd like to bring the Court's attention to the Turner Broadcasting case, because in that case, it says specifically that – oh, my bad – that this is so, even though it may not correspond with the contentions of either party. That's a direct quote from Turner Broadcasting. So the Georgia cases say that, but we do need a reasonable basis, right? Ultimately, what reasonable basis means simply is that it's supported by substantial evidence. And again, ordinary tort damages rules apply in these cases. You know, in tort cases, juries are entrusted with determining things like loss of business goodwill, or in, you know, more conventional tort cases, emotional distress, right? We vest our juries with really wide latitude to determine things that aren't always perfectly capable of precise apportionment. And in this case, we're talking about Medallia's unjust enrichment from lifting and shifting a unitary product into its other. So its profits that it gained, its benefits that it reaped, were not reaped on a trade secret by trade secret basis. They were reaped on a unitary basis. I mean, I guess maybe you've answered this, but I'm going to ask it again, and you can answer it again if you already have. You can imagine a case where the evidence comes in, and it is basically, you know, we've got these five violations that we're alleging, and the total value of these violations is $20 million. And nothing else is said about how you would break out for each individual violation. You could imagine a state of the evidence where it's sort of an all or nothing, right? There's this package of violations. This is the price tag associated with them. And the jury or the fact finder is giving no tools to parse. So here the question is, did the jury have some sort of tools to parse, or is this an all or nothing record? This is not an all or nothing record. And that actually brings me to the O2 Micro case and the reason that this case is so different from O2 Micro. In that case, you had disjointed trade secrets. They were not part of a unified structure. They were not part of a single program. You had multiplexing pins or something of that nature in the back of an LCD screen, which is what, you know, what our computers and TVs had. And then on the other hand, you also had cost data in Microsoft Excel spreadsheets, right off to the side. In that case, to bundle those all together, it didn't, you know, under the facts of that case, the court said out the gate, you know, before trial, you're going to have to go with this on an all or nothing. But it wasn't dealing with a unified structure. So in a case like this, where you're dealing with a unified structure, it makes much more sense to look at those unjust enrichment, that unjust enrichment, holistically and work down. And so in ATS, where you had a unified structure, or excuse me, in Bladerim, where you had a unified structure, the court said explicitly that. It said that, no, under California law, citing a California civil code section identical in substance to the Florida section at issue here, said there's nothing in the section that requires apportionment. You're dealing with a unified structure. This is a perfectly permissible theory. So in that way, our case is fully set aside from O2 micro. And in fact, in that case, as we mentioned in our briefs, thinking about just the purpose of Rule 702, right, Federal Rule of Evidence 702 and the need for expert testimony, that's required in very limited cases, right, only where the jury could not possibly comprehend something without the assistance of an expert. It's permissible in a wide range of other cases. This is a case in which, sure, it was permissible, but it was by no means required. Very different when you're dealing with a complex, frankly impossible to understand what they are, trade secrets at issue in O2 micro. Sotomayor, are you saying that it would have not been possible to break out, to apportion each trade secret with respect to the amount of damages or unjust enrichment? Mr. Ratner, the expert, did testify that actually in this type of integrated software bundle, it is not appropriate to do that type of analysis. And even still, when we look at the, you know, he didn't just give the jury numbers. Mr. Ratner gave the jury explanations, conceptual explanations for each category of unjust enrichment. So saved costs was measured in terms of person hours, right? The jury was actually looking at a number of hours over time that people worked or didn't work. As far as Head Start, it was done on basically a matrix of 12 months, 18 months, 24 months, and two, three, and I believe $5 million, right? So there was this whole matrix of possible numbers with that $8 million and change being the midpoint. So in this case, the jury really did get a lot of information. How did he quantify unjust enrichment? Unjust enrichment was Medallia's profits achieved by the misappropriation. So that was at least as the ill-gotten gains component. So it was the ill-gotten gains from Medallia's profits. It was the person hours saved in saved costs. And then in Head Start, it was that matrix of how long and how much are you saving. So the jury really had a lot of information to work with. Let me ask you this. So the jury has all this information, has the expert's report or the expert's testimony from those experts. Goes back into the jury room and starts answering the special verdict form. And they conclude that of the, I guess there were eight or nine. I can't remember now exactly. Nine trade secrets. Two had been removed. Two had been removed. Okay. And they say they failed to, you know, they conclude that with the exception of trade secret six, that the plaintiff failed to meet its burden of proof. And so they find no trade secret. I forget exactly what they did, but they found no protected trade secret.  Okay. So now they're, and they've got all this information on damages. So the district court kind of had its theory about what the jury did. What is your explanation for what the jury did? Our explanation is simply that the jury looked at the total damages amount, looked at the evidence regarding the role, the importance of trade secret six, that it was the heart of everything, that it was the most important trade secret, without which everything else could not function. Looked at the expert testimony saying that that is relevant to determination of damages and that it's appropriate even to award all if the primary value drivers remain in play. And they worked from that, and they decided to apportion between trade secret and non-trade secret factors, which juries under both the Georgia cases and the federal cases are entitled to do. To look at trade secret and non-trade secret factors, you see it in White. You see it in Trotman. You see it in Russo. You see it in actually in Caudill. They actually just awarded the full profits. They didn't even apportion. Caudill won trade secret out of four, and they afforded the full profits, and that was affirmed. Let me ask you. Your time is running out, but let me ask you on the motion for a new trial. Yes. What do you have to say about that? Sure. I mean, it's certainly an unusual circumstance, but in this case, it's the fact that it is a novel issue of law, as the court recognized, right? Before trial, it said that it was for the jury to weigh the admissible evidence at trial on this issue. So before trial, the court approached this like ATS and Blade Room, where the court said, we don't need expert apportionment testimony. Then in the middle of trial, the court kicked out two trade secrets and even still said, I think it's more of a jury verdict and instruction issue, right? So at that point, the court had not decided that the law was, it needs to be all or nothing. And only after trial did the court reverse course, no longer acknowledge that this is a novel issue of law, and basically say that this has been established all along. But, of course, the court had the right to or the power to reserve that ruling until the end of trial, but the pivot from mid-trial when two were already gone, so the court's reasoning was equally applicable mid-trial. So to save that pivot for the end of trial really underscores what a left turn this was. And then as far as a new trial being available to avoid a miscarriage of justice, $25.7 million, including $14 million in punitive damages for this willful and malicious theft. They lied to get access. It's just a miscarriage of justice. Exactly. What remand or what order would you like us to make? Reinstate the verdict or what? Reinstate the verdict. The whole verdict? The whole verdict, yes. Reinstate the compensatory damages verdict, which would in turn reinstate the punitive damages verdict. All right. Let's save some time for rebuttal. Thank you. Thank you, Your Honor, and may it please the court, Chris Michel for Appelli Medaglia. Echospan brought this case based on a bundle of nine asserted trade secrets arising from a software product that had been widely disclosed. The district court and the jury together concluded that eight of those nine trade secrets were not trade secrets. The court then correctly granted judgment as a matter of law to Medaglia because Echospan, despite multiple warnings and an opportunity in its rebuttal case, gave the jury no sufficient basis, no causal connection, as Judge Bea put it, to apportion relief to the sole remaining trade secret. Why didn't the district court do this before the jury got it, if that was true? I think the district court could have done this after throwing out the two trade secrets at Rule 50A. Instead, the district court, in an abundance of caution, gave Echospan an opportunity in its rebuttal case to try to prove apportionment, but they failed to do that. And I think the same result follows afterward. What case do you cite, do you rely on, to argue that apportionment was required? Well, I would give two answers, Judge Pius. First, the general principle that a jury must have a sufficient evidentiary basis for any form of monetary relief. That's established in courts for decisions from this court like Harper and Yeti, and then it's applied to this particular context of a multiple trade secret case. All of the courts that have addressed this issue, I'll concede they're mostly district courts. The O2 micro decision from the Northern District of California, the Versada decision from the Eastern District of Michigan, have all said that there's a straightforward rule. When you have multiple trade secrets, you as the plaintiff can decide to introduce a damages theory. Not required, though. Well, you have to make a choice. What's required is a choice. You can proceed on an all-or-nothing theory, and if you prove all the trade secrets, then you can collect all the damages. Or you can proceed on an apportionment theory, and if you don't get liability on all the trade secrets, there's a sufficient evidentiary basis for the jury to award relief on the subset. The plaintiff has to make that choice. The plaintiff in this case knew that. It made the choice to proceed all-or-nothing. There's nothing wrong with that choice in the abstract, but it does have consequences. Now, the judge, the district, was it? I forget who the judge was. Judge Cousins, yes. Judge Cousins, he didn't quite put it in those words to plaintiff. Well, I think there was no dispute all along that there was this choice that had to be made. We, of course, made clear from the beginning that the lack of apportionment was going to be one of our defenses if the plaintiff ended up proving fewer than all of the trade secrets. We have pretty strong case law, pretty much true in the state courts as well, that you do everything possible to reconcile jury verdicts with the evidence. That's because we bring these people in and charge them with the responsibility of being finders of fact and to determine liability and damages. And you just don't want to throw it out, right? That's right. Why can't this, as counsel just argued, why can't this result here, the jury's verdict, which was half of what the experts testified to, why can't it be reconciled here? There was plenty of evidence in the record about the importance of this particular trade secret. Let me offer something. The jury could have found all these other trade secrets as protected. The expert testifies to X, Y, and Z, right? And they could say, well, no, we're going to cut 30%. Let me give you a couple of answers to that. A couple of things, Judge Pius. First, this is the unusual case in which the damages expert, the witness that the plaintiff put on to establish its damages case, said in terms, and this is at page 1498 of the excerpts of records, if the jury finds fewer than all of the trade secrets, a liability on all the trade secrets, the jury will have, quote, no way to figure out from my calculation what the damages should be. That's an unusual concession, and it's an important one in this case because, of course, the jury did go on to find liability on fewer than all the trade secrets. That sort of hypothetical that the damages expert gave became reality. I mean, that gets at sort of a question that I was asking your friend across the aisle of even if the expert says you're not going to find the answer of how to apportion this in my calculation, that doesn't mean that the record is devoid of tools for the jury to do this analysis. So why do you think that there was nothing for the jury to wrestle with or work with to make that decision? Sure. So I agree with you as a categorical matter. We're not submitting that there has to be expert evidence, but there does have to be evidence. And here, really, once you put the expert aside, which was, of course, their primary damages argument, once you put the expert aside, I think what they're relying on is a handful of statements from the founder of EchoSpan, Mr. Vance, in the rebuttal case, where he says things like trade secret six was the head of the octopus or the core or the heart of the product. Couldn't they also sort of make that judgment themselves after seeing demonstrations of this system and see that trademark six was sort of more important than the others? So I think the demonstration didn't, you know, really didn't go to the damages issue, but I do want to, I think there's an important point there, which is that, and I think Judge Bea mentioned this in the topside argument, the relief here is unjust enrichment. My friend and I agree on that. The measure of unjust enrichment is its value to Medallia, the defendant, and all the testimony that they referred to, including that demonstration, is about the importance of trade secret six to EchoSpan's product. He's saying it's important to our product, but that, by definition, does not speak to its value to Medallia. As my friend discussed, there were three categories of unjust enrichment, Medallia's profits, saved costs, and Head Start. All of those measures of unjust enrichment depend on what was going on inside Medallia. How much of a Head Start did it get? How much cost did it save? What were its profits? Statements about the value of the trade secret to EchoSpan simply don't address that issue. Of course, how does a plaintiff normally address that issue? Through a damages expert, and the damages expert here tried to do that, except we have this unusual situation where the damages expert, by his own admission, didn't provide evidence that the jury could rely on. So there is, with respect, a real gap on the fundamental question of how to calculate the unjust enrichment. Your position is the only other evidence that they had to work with is the statements from EchoSpan's people. They could rely on anything in the record. I just don't think there's anything in the record that supports it, and I think my friend is relying on those statements, so I wanted to take those on. Let me ask you this. When you prepared the, whoever prepared the special verdict, why wasn't there a question, why wasn't there an instruction? Because a special verdict is a form of an instruction. Why wasn't there an instruction that if you don't, that if you, if you don't find a violation of all the, or if you don't find, if you do not find that all of the trade secrets are protected, then you're to award no damages. I believe we asked for that instruction.  I believe we did ask for that instruction, and the district court didn't give it. I don't, although I think the district court correctly set out the law, nevertheless it wasn't required to give that instruction. It's possible that it could have been clearer, but that the instruction could have been clearer. But I think the principle is still established by this court's cases, and in particular. Why shouldn't, just under that principle, why shouldn't they get a new trial? Well, they shouldn't get a new trial because I think there's no legally sufficient basis in the record. Maybe if they had been told, I mean, if they knew at the outset of what they had to do, they would have met that burden. With respect, Judge Pai, as I think they did know at the outset, based on the legal principles that. . . At the outset, before trial, the district court told them otherwise. I have to disagree with that premise. The district court never said anything like, you don't have to apportion in this case. Quite to the contrary, the district court allowed the testimony from Mr. Ratner, but he recognized that there could be argument on what to draw from that. And then he could not have been clearer when he granted the Rule 50A motion that they had, quote, a big problem because they had now lost some of the set of trade secrets and yet had a damages theory that relied on all of the trade secrets. There is nothing wrong with proceeding on an all-or-nothing damages theory. That is a strategic choice that litigants are entitled to make. But they do have to live with the consequences of that choice if they don't prove all of the trade secrets. And, of course, here, not only did they not prove all of the trade secrets, they only proved one of the nine trade secrets. We submit that O2 Micro is pretty much, as Judge Cousins said, a dead-on bullseye for this case. You know, that is the – I think it's fair to say the leading opinion in the nation on this question about apportionment in multiple trade secret cases. We recognize it's a district court decision, but I think it's a well-reasoned district court decision from the Northern District of California. It's been cited all over the country. It's been relied on in the Versada case. It was relied on in the Sixth Circuit in the Cottle case. It's been relied on by the trade secret treatises. And most importantly, I think it's an application of the fundamental principle that there has to be an evidentiary basis. So you should make it – doesn't that make it almost impossible for a plaintiff with a trade secret to prove? Not at all. But they have like – just like this one. This was like an integrated whole. So a couple of responses. First of all, not at all. It's common. You shop around and you find an expert who's willing to testify. Well, I guess people do that anyway. You just shop around and you find an expert who's willing to support your theory and get up and testify.  I think if there's a good faith basis for that kind of expert testimony, of course.  That's what plaintiffs should do, and they do that frequently in trade secret cases. I want to respond to a part of your question that my friend mentioned also, and that's this unified structure theory. This is a critical point. Judge Cousins found, and I think it's absolutely correct, that this cannot be considered a unified structure. And the reason is that Trade Secret 5, that's the trade secret that was thrown out at the Rule 50A stage, is not integrated with the rest of the product. The rest of the product has to do with how a client uses the employee review software. Trade Secret 5 has to do with how Echospan manages its clients. It's called the client management portal. And this is a little bit in the weeds, but Judge Cousins lays this out in detail at pages 25 through 27 of the excerpts of record when he's issuing his post-trial decision. And Mr. Vance conceded during his testimony that Trade Secret 5 was separate from the rest of the product. He also conceded that other features of the product, some of the other individual trade secrets like 7 and 8, separately drive value. So this unified structure concept simply doesn't work with the evidence here. So let me see if I understand that in a different way, which is that because in your view it wasn't a unified structure, Medallion could just go in and take whatever it needed to enhance its own software. Not at all, Your Honor. Not at all? If the jury had found... So you didn't have to go in and snatch the whole thing and merge it with yours. If the jury had found that these were secret, remember the jury found 6 of the 7 remaining trade secrets when it got to the jury, found that they were not secret. So if something is not secret, there's not a trade secret violation if you go in and snatch it. Well, they were a little bit troubled with what you did because they did award punitive damages. They did award punitive damages. I mean, you don't award punitive... Juries don't award punitive damages just, you know, willy-nilly. I don't know, but that is a categorical matter. But in this case, I don't think the punitive damages... Well, the court's not going to instruct him on punitive damages unless there's some evidence, correct? That's right. We dispute the punitive damages were available, but I think everybody agrees here that if the unjust enrichment award for trade secret 6 falls, the punitive damages award has to fall too. And so our principal submission is that there is no evidentiary basis. There's no... In the text of the statute, Judge Bea, it says that the unjust enrichment has to be caused by the trade secret misappropriation. That's 18 U.S.C. 1836 B.3.B. So this causation requirement is there. But isn't there evidence from which a jury could find that simply stealing number 6 can cause the damages? There was nothing in the record... This is the critical point. There was nothing in the record that would allow them to find that. Remember, the damages expert said that if there were fewer than all, they would have no way to figure it out. No way of figuring out his calculation, but not necessarily not figuring out another calculation. I mean, they could have just taken the requested 23.4 million in compensatory damages and said plaintiff is exaggerating this. We'll give him 50 percent, 11.7. I don't think so, Your Honor. It may have happened once or twice in the history of jury trials. I do think there has... Under this Court's cases, you know, there has to be some basis in the evidence for the verdict. I think just arbitrarily cutting it in half, you know, would be the kind of conjecture or guesswork or speculation that this Court has consistently said is not enough. I will say this 50 percent theory, and this is something that my friend respectfully didn't raise in the district court and raises here for the first time. There's a good reason for that. The best way to understand the verdict form itself is that the court, that the jury, awarded all of the Head Start and Saved Costs awards, and we go through that in our brief. But in that case, there's no 50 percent cut. And this is how Judge Cousins understood it, too, and his reading of the verdict is entitled to deference under cases like service employees. That's an important point because understanding the verdict that way means there was no apportionment, no 50 percent cut, they did exactly what they were not allowed to do. That's the point of just sort of like how can we know, one way or another, and if it's possible that it's not that reading and it's the reading that Judge Bea just advanced, then don't we have some sort of reasonable basis for this jury verdict that we can't touch? I mean, you talk about deference to the district court, sure, but deference to the jury is a big deal. I understand that point, but there would still need to be something in the evidence that would support this 50 percent cut if that's how you wanted to do it. And the something in the evidence, I guess, is sort of the point that I was talking about with your friend across the aisle. You find less than all the violations, you award less than all the damages presented, some sort of correlation. Right, but I think the problem is there's nothing that allows the jury to get to this number. There's certainly 50 percent was never mentioned until this court, so that couldn't be what it was. And with respect, there was just nothing else in all of the rest of the record that would lead to this 50 percent result. All right, thank you, counsel, for your argument. Thank you, Your Honor. All right, Your Honors, I would like to talk quickly about the unified structure issue. I would like to give an example here. We probably all use either Microsoft Windows or Apple operating system. There's a lot of portions of that operating system that are user-facing, right? But also on the back end, Apple and Microsoft can do things too. They can push through security patches, updates. Windows is an integrated software program. It is a unified structure. That's what we're dealing with here. So just because one portion was EchoSpan-facing doesn't mean it's not a unified software system. I'd also like to bring the court's attention to the standard in Georgia under the Kenton Plaza case that only where there's a complete absence of competent evidence on the issue of damages can you take that away from the jury. That's not what we have here. In fact, that's identical to the lenient standard in Caudill, a case in which one out of four trade secrets was found to have been misappropriated, but because it was incorporated into the offending products, four products, the plaintiff got all of the unjust enrichment without apportionment. At the end of the day, the judgment is within the evidence shown under all of these cases in Georgia law and federal law. I think you just must reverse. Thank you. I thank counsel for their helpful arguments. The matter of EchoSpan v. Medallia is submitted.
judges: PAEZ, BEA, FORREST